(70 Hun, 597.)

## SMITH v. NEW YORK STOCK & PRODUCE CLEARING HOUSE CO., Limited.

*(Supreme Court, General Term, Fifth Department.  June 23, 1893.)*

PRINCIPAL AND AGENT—PROOF OF AGENCY.

> Defendant, a company organized in New York city to buy and sell stocks on margins, leased from telegraph companies wires running to various cities, and employed a man, whom it called a "correspondent," at each of such cities to take the wire. It agreed to deposit a large sum of money to secure to the customers of one R., its "correspondent" in the city of Auburn, any profits that they should make on orders given to R. to buy stock for them. Defendant received from R. the margins deposited by his customers, and allowed him a rebate of one-half of the commissions as his pay for getting the orders. *Held,* that R. was defendant's agent to receive orders, and the fact that he signed the bought notes in his own name was immaterial.

Appeal from circuit court.

Action by Fred A. Smith against the New York Stock & Produce Clearing House Company, Limited, impleaded, etc., to recover money paid by plaintiff to defendant for margins on orders to buy stocks. There was a judgment in favor of plaintiff, and defendant company appeals.  Affirmed.

The opinion of Mr. Justice RUMSEY, before whom the cause was tried at circuit without a jury, is as follows:

In the year 1890, the defendant, George C. Ryan, was the manager of an establishment in the city of Auburn, at which the plaintiff and others were accustomed to leave orders for dealing in stocks upon a margin. During the months of October and November of that year the plaintiff ordered certain purchases of stock to be made, which were represented by Ryan to have been bought for the account of plaintiff. At the time of making the orders the plaintiff paid Ryan 1 per cent. on the par value of the stock as security. As the stock declined, more security was called for, and plaintiff, as often as the calls were made, which was frequently, paid additional margins of 1 per cent. until the transaction was stated to have been closed, usually by the sale of the stock upon the failure of the plaintiff to put up the required margins. The net result to plaintiff was a large loss, which he now sues to recover. His claim is that Ryan was the agent of the defendant corporation; that they received the margins, and agreed to buy and carry the stocks; and that, although they reported the purchases of stock, they never in fact bought any, and never had any stocks which they were carrying for plaintiff, or which they could have delivered to him. The defendant corporation denies that Ryan was its agent, but alleges that it bought stocks on Ryan's order and for him only, with no knowledge whether he acted for himself or for others. It claims also that it bought stocks to fill the orders from Ryan, and at all times had stocks on hand to deliver in fulfillment of the orders, if demanded. It will be observed from this statement that the serious questions are those of fact.

First, then, was Ryan the agent of the corporation in doing this business? The evidence shows that the corporation was organized to deal in stocks, and that for several months it did a large business buying and selling stocks on margins upon orders received from persons in the smaller cities. It did business with them all in the same general way in which it did with Ryan, there being some slight difference, of course, in details. The office of the corporation was in New York; that of Ryan, in Auburn; and his office was connected with that of the corporation by telegraph wire from one to the other. The corporation had private wires leased from the telegraph company, and

from these wires it was put in direct connection with its several "correspondents," as it called them, of whom Ryan was one. So far as it appears, the company did all its buying and selling with persons in the country through these correspondents. The evidence shows that the arrangement between Ryan and the company, whatever it was, was made by one Underwood, who was a traveling agent of the company for soliciting business and making arrangements. All agree that plaintiff was present when the arrangement with Ryan was made. The plaintiff says that Underwood asked Ryan to act as agent for the defendant company; that he made statements as to the mode of doing business and as to some other concern, which are not material here. Ryan says that Underwood asked him to take the wire of the company, and agreed to put up $1,000 in some Auburn bank to protect his (Ryan's) customers in case they should make a profit. Ryan does not use the word "agent" in that connection. Underwood does not say what was the talk between him and Ryan. He was sworn as a witness for the company, but the questions put to him by defendant's counsel were skillfully framed to prevent his telling what the arrangement was. He denied using certain modes of expression which Smith says he used. He says he never asked any one to act as agent, and that he had no authority to appoint Ryan their agent, and that is all. He carefully avoided telling what his authority was, or what instructions he had. But it is quite clear from his cross-examination that the talk was substantially as Ryan says it was, and it is very probable that if Underwood had been allowed to tell the whole story he would have practically corroborated Smith's, except perhaps in regard to the use of the word "agent." But as it is, no weight can be given to testimony so carefully filtered through leading questions. But whether the word "agent" was used or not is not very important. The real question is, what was Ryan to do for the company as its correspondent? What was the nature of the arrangement between them? It is quite clear that Ryan was expected to send orders to the company for the purchase and sale of stocks by them, and these orders were to be sent in his name. But while they were to be sent in his name, it is very evident that they were understood by all parties not to be his individual orders, but those of his customers, and the company put up a deposit of $1,000 to guaranty the profits of the customers, not of Ryan. It is clear, too, from all the correspondence that the "trades," as they were called, were recognized to be those of the customers. For making and attending to these orders the customers paid Ryan one-fourth of 1 per cent. commission. This was paid by Ryan to the company, and he received one-half of it back. The half was his pay for what he did. It is true, Platt says, that Ryan paid them one-half commissions he got for the use of the wire, but it is evident from the entry on the account of Ryan that, instead of being charged one-half commissions, he had a rebate of one-half of them, showing that the commissions were the company's, and they allowed Ryan to pay over one-half, instead of all, to them. Ryan swears that the money deposited by the customers as margins he at once deposited to the credit of the company. This is not denied, and it is in proof that a large part of the money so deposited was drawn by the company, and that the remainder, having been attached by Ryan, the attachment was released only upon condition that it should remain in the bank for the protection of the customers, which condition was acceded to by the company. See Ryan's telegram of November 13, C. 96,401, and answer of defendant on face of it.

We have, then, these facts: A company is organized to buy and sell stocks on margins. It leases wires running to different cities, employs men at each of these cities to take the wire, agrees to deposit a large sum of money to secure the customers of one of these men in the profits they shall make on their orders, receives the margins deposited by the customers; and allows the correspondent a rebate of one-half of the commission as his pay for getting the orders. If these facts do not show beyond question that the correspondent was the agent of the company to take the orders, no legal inference can be drawn from them. Two facts are presented as proving the contrary. The first is the blank contract for doing business. But it is not claimed that contract was ever executed, or that Ryan ever saw it, or acceded to its terms. The second is that the bought notes given to the plain-

tiff were signed by Ryan. But in the case of contracts of this kind it is always competent to show that the contract, though signed by the agent, was really the contract of some one else who is sought to be charged as principal. Coleman v. Bank, 53 N. Y. 388; Dykers v. Townsend, 24 N. Y. 57. I conclude that Ryan was the agent of the company, and that the fact that he signed the contract has been explained, and the liability of the contract fastened upon the company. The contract was to buy the stock in the open market; to carry it so long as the customer shall pay the margins, or until notice is given; and, when required, to deliver it to the purchaser upon payment of the remainder unpaid of the purchase price. If the broker buys the stock, he need not keep in his safe for delivery to the customer the identical certificate which he bought to fill that order, but he must keep in his possession or under his control, ready for delivery, the same amount of other shares of the same stocks. Taussig v. Hart, 58 N. Y. 425; Caswell v. Putnam, 120 N. Y. 153, 24 N. E. Rep. 287. He must, however, buy the stock, and have it on hand to deliver; and the contract is not performed unless the stock is in his possession. He does not perform his contract with the principal by merely making a bargain with some other person to buy stock of him which the broker can get by paying for, but which he does not obtain. See cases above cited. Now, was that done? Platt says that they always had on hand enough of any stock bought for plaintiff to fill his order. But Platt was a very much interested party, and I am sorry to say that I was not impressed with the truth of his testimony. He was swearing to win the suit. His cross-examination does not bear him out, but shows that the buying of stock to fill plaintiff's orders was just like the selling stock to him. It appears from his testimony that one Eby sold to the company 20 shares of Chicago Gas stock. Platt says of that transaction that Ryan bought and Eby sold; one balanced the other. He did not know whether there was a delivery of scrip from Eby. They had the "gas" coming from Eby. They had a contract with Eby that Eby had to deliver. This is probably the exact fact. The evidence was that when orders to buy were given the report of the purchase was sent at once if the order of the buyer was to buy at the market price, and, if the order fixed the price, just as soon as that price was touched. That was the invariable rule. Platt says, in spite of the report, they did not then buy, but they waited until they could get the stock cheaper,—"until the next day." He says, too, that it was his custom to buy stocks when they were low, and sell them to customers at the market price when ordered; which, it may be said, is a fraud upon a customer. Taussig v. Hart, 58 N. Y. 425. It appears that this company had from 30 to 50 agents. The customers of each were buying and selling stocks on margins, and the orders all came to the company. All these were contracts to deliver stocks to the buyers, either the company or the customers, with no scrip delivered, and only margins paid. Platt said that if during the day he had orders to buy 5,000 shares and orders to sell 4,500, he charged the customers who bought the market price, and credited the customers who sold the market price, and bought 500 shares to even it up. He said, too, that when he had to buy to equalize his contracts he generally waited till the market went down, and he could buy cheaper than his orders. He said on his redirect examination that from time to time he had a statement to show exactly how much more stock he had to deliver than he had a right to receive on his outstanding contracts, and then he provided for the difference. This difference, as appears, was bought usually on margins, and the stock was not held by the company, but by the brokers who bought it. It appears from this that, so far from buying the stock ordered by plaintiff, and holding that or like stock for him, the company had only to keep its contract to deliver to him, provided an agreement with some one in Boston or Syracuse or Little Falls to sell stock to it, or a like contract with some broker in New York, and it had no real delivery of shares. This is not such a performance as the law requires. In fact it appears clearly that the only thing done by this company was to take the money of the plaintiff, falsely represent that it had bought

the stock, and ask for more margin. It is a satisfaction to know that out of their own mouths the facts come which require the court to hold that this money must be refunded. Judgment is ordered for plaintiff.

Argued before DWIGHT, P. J., and MACOMBER, LEWIS, and HAIGHT, JJ.

W. W. Niles, for appellant.
Payne & O'Brien, for respondent.

PER CURIAM. Judgment affirmed on the opinion of RUMSEY, J., at circuit.

---

BRAYTON v. NEW YORK, L. E. & W. R. CO.

(Supreme Court, General Term, Fifth Department. October 20, 1893.)

SUMMONS—SERVICE ON CORPORATION—MANAGING AGENT.
    The division superintendent of a large division of a railroad, remote from the company's general office, is a managing agent, within Code Civil Proc. § 431, subd. 3, providing that service of summons on a corporation may be on "a managing agent."

Appeal from special term, Erie county.
Action by Anna Brayton, administratrix, against the New York, Lake Erie & Western Railroad Company. From an order denying defendant's motion to set aside the service of the summons, defendant appeals. Affirmed.

Argued before DWIGHT, P. J., and LEWIS and HAIGHT, JJ.

A. D. Scott, for appellant.
Wm. H. Clark, for respondent.

DWIGHT, P. J.    The service of a summons in an action brought in Erie county for the death of the plaintiff's intestate was made upon the division superintendent of the defendant at Buffalo, his division having as termini the cities of Buffalo, Jamestown, and Hornellsville. The objection made to the service is that the person served was not "a managing agent" of the defendant, within the meaning of the statute, (Code Civil Proc. § 431, subd. 3.) We think the objection is not well taken. It will be observed that the requirement is not that the service shall be made upon the managing agent, but only upon a managing agent of the defendant. That the division superintendent of a large and important division of the company's road, remote from the general offices of the company, is such, we can have no doubt. In the case of Palmer v. Railroad Co., 35 Hun, 370, affirmed 99 N. Y. 679, it was held that "the statute is satisfied if he [the person served] be a managing agent to any extent." In Ruland v. Publishing Co., (City Ct. N. Y.) 10 N. Y. Supp. 913, a managing agent was defined to be "a person having independent, discretionary control in the locality where his duties are performed." In Barrett v. Telegraph Co., (Sup.) Id. 138, it was held that "if he [the person served] sustain